**In the Matter of the EXTRADITION OF Kamel NACIF–BORGE, Extraditee, and a Fugitive from the United Mexican States.**

No. CV–S–93–453–PMP–(RJJ).

United States District Court,
D. Nevada.

July 27, 1993.

Charles Goldberg, Patrick Q. Hall, San Diego, CA, Richard A. Wright, Las Vegas, NV, for extraditee, Kamel Nacif–Borge.

Asst. U.S. Atty. J. Gregory Damm, D.Nev., Las Vegas, NV, for U.S. of America.

### ORDER

PRO, District Judge.

The Court having read and considered the Amended Opinion and Order filed by the Honorable Robert J. Johnston, United States Magistrate Judge, on July 16, 1993, and good cause appearing,

IT IS ORDERED that this Court adopts the Findings of Magistrate Judge Johnston regarding the special circumstances presented in this case.

IT IS FURTHER ORDERED that Extraditee Nacif shall be permitted release on a signature bond in the amount of $12,453,-644.00, to be secured by a cash deposit of $2 million, with the further condition that Extraditee Nacif's travel be restricted to the State of Nevada and that he be placed under the supervision of Pretrial Services.

### *AMENDED ORDER*

[Motion for Bail Pending Extradition Proceedings (# 10)]

JOHNSTON, United States Magistrate Judge.

This matter was submitted to the undersigned Magistrate Judge as part of an international extradition case involving the United States of America and the United Mexican States, specifically on a Motion for Bail Pending Extradition Proceedings (# 10) brought by Extraditee Kamel Nacif–Borge. The court convened a hearing on the matter June 11, 1993.[1] Thereafter, the parties submitted additional items at the court's request.[2]

### *FACTS*

Kamel Nacif–Borge (Nacif) is a citizen and resident of the United Mexican States (Mexico). Nacif was born on May 13, 1946, in Mexico and maintains his permanent residence in Mexico City with his family, consisting of his wife of seventeen years and his ten year old son. Nacif also has a fifteen year old daughter who attended, but has since graduated from, a private school in Oregon. Nacif's mother, father, brother, sister, and two uncles also reside in Mexico. Memorandum of Points and Authorities in Support of Motion for Release on Bail (# 10) at 1.

Nacif is self-employed, primarily as a textile industrialist. He is the majority shareholder in two textile companies, Textiles Kamel Nacif S.A. and El Rosario S.A., each with factories in Puebla, Mexico. These companies manufacture denim and yarn and collectively employ approximately 900 workers. One letter from a cotton company indicates that Nacif "is the biggest single importer of American raw cotton for Mexico" and mentions that he uses approximately $30 million dollars worth of cotton a year for his operations. Letter from Ernesto Gonzalez Madero of Algodonera Torreon S.A. de C.V. attached as Exhibit O to Motion for Bail (# 10). One Mexican newspaper article refers to Nacif as the "King of the Light Tweed." El Economista, May 19, 1993, Exhibit AA attached to Motion for Bail (# 22). In addition to textiles, Nacif also owns an agricultural corporation named Campeche, which is involved in cultivating 14,000 acres for the production of citrus concentrate. He

---

1. The bail hearing was set for this date at the request of Nacif's attorneys at his initial appearance on May 17, 1993.

2. Nacif submitted the following:
   1. Certified translations of Articles 59, 92 & 95 of the Internal Regulations of the Mexican Department of Revenue and Public Credit (Hacienda) on June 11, 1993;

2. Certified translations of Articles 59, 92 & 95 of the Fiscal Code of the Federation on June 16, 1993; and,
3. Case law addressing the issue of "special circumstances" not previously cited (# 21) on June 23, 1993.

The Government submitted the following:
1. Government's Submission of Additional Information (# 20) on June 21, 1993.

also owns a dairy. Motion for Bail (# 10) at 2. Nacif does not own any property outside Mexico.

Nacif visits the United States often and frequently vacations in Las Vegas, Nevada. Motion for Bail (# 10) at 2. Hotel records from Caesars Palace verify seventy-six times in the last five and one-half years when Nacif was a guest. Exhibit F attached to Motion for Bail (# 10).

On May 7, 1993, Nacif travelled to Las Vegas using a valid Mexican passport on a scheduled vacation. Motion for Bail (# 10) at 3. Caesars Palace computer records reflect a check-in on May 7, with a scheduled departure for May 17. Exhibit G attached to Motion for Bail (# 10). On May 7, the Ninth Penal Judge for Criminal Matters to the Court for the Federal District of the United Mexican States issued an arrest warrant for Nacif. Exhibit D attached to Government's Submission (# 20). On May 15, Nacif was arrested in his hotel room at Caesars Palace Hotel & Casino by United States Marshals executing a Warrant for Provisional Arrest issued by this court pursuant to Title 18 U.S.C. § 3184 and Article 11 of the Extradition Treaty Between the United States of America and the United Mexican States (Treaty), signed in Mexico City, May 4, 1978, 31 U.S.T. 5059, entitled Provisional Arrest. *Id.* at 14; Warrant for Arrest (# 4).

The Mexican arrest warrant and subsequent provisional arrest warrant in this country were based upon allegations of tax evasion in violation of Articles 92 and 95, Paragraphs 1 and 2, of the Fiscal Code for the Mexican Federation, punishable by Article 108, and failure to provide financial documentation in violation of Article 59, Section III. The factual allegations in the complaint assert that Nacif failed to pay $50,381,623,-841.00 Mexican Pesos ($15,567,180.00 in U.S. currency) in income tax to the Mexican Treasury for fiscal year 1991 and failed to file an income tax declaration, resulting in an audit by the Secretariat of the Treasury's General Directorate of Federal Fiscal Auditing. Complaint (# 1) at 2.

## DISCUSSION

*Introduction*

■■■ The primary concern in an international extradition matter is to deliver the extraditee to the requesting nation. The statute that governs international extradition proceedings, Title 18 U.S.C. Section 3184, makes no provisions for bail. Additionally, the Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.,* used by this court on a regular basis in criminal cases has no application to international extradition because this act applies only to persons accused of committing crimes against the United States. *United States v. Hills,* 765 F.Supp. 381, 385 n. 5 (E.D.Mich.1991) ("several courts have expressly held that ... the provisions of the Bail Reform Act do not apply in extradition actions," citing *United States v. Taitz,* 130 F.R.D. 442, 444 (S.D.Cal.1990)). Each separate extradition treaty between the United States and a foreign nation is sui generis, and as a contract between two sovereigns, sets forth its own law.[3] However, the treaty between the United States and Mexico does not outline bail procedures, or indeed mention bail whatsoever.

■■■ The concept of bail pending international extradition appears to have originated with the U.S. Supreme Court in *Wright v. Henkel,* 190 U.S. 40, 63, 23 S.Ct. 781, 787, 47 L.Ed. 948 (1903). Although it is "unusual and extraordinary" for bail to be granted, it is not impossible to obtain bail in an international extradition treaty case. *United States ex rel. McNamara v. Henkel,* 46 F.2d 84, 84 (S.D.N.Y.1912); see also John G. Kester, *Some Myths of United States Extradition Law,* 76 Geo.L.J. 1441, 1447–49 (1988) (characterizing the proposition "Bail Is Not Available in Extradition Cases" as a myth). Caselaw has clearly established that bail may be granted under "special circumstances." *Wright v. Henkel,* 190 U.S. 40, 63, 23 S.Ct. 781, 787, 47 L.Ed. 948 (1903); *Salerno v. United States,* 878 F.2d 317, 317 (9th Cir. 1989); *United States v. Williams,* 611 F.2d 914, 915 (1st Cir.1979). However, caselaw has not clearly explained precisely what

---

**3.** To date, the United States has entered into bilateral treaties of extradition with over 100 separate nations. See Editorial Notes to 18 U.S.C. § 3181.

"special circumstances" means and to what degree of proof the extraditee must demonstrate such circumstances. Consequently, commentators have expressed concern that the doctrine is uncertain, and that the "amorphous 'special circumstances' standard has resulted in an incoherent approach to bail in international extradition cases." Jeffrey A. Hall, Note, *A Recommended Approach to Bail in International Extradition Cases*, 86 Mich.L.Rev. 599, 599 (1986).

This characterization of existing caselaw in disarray is betrayed by a consistent pattern of analysis grounded in unmistakable standards. The judicial reasoning in extradition cases parallels traditional bail evaluations with some obvious adjustments for the international ramifications of the bail decision. The opinions universally contain the following:

- A. A presumption against bail exists in international extradition cases.
- B. Only special circumstances will justify bail.
- C. The person seeking bail has the burden of establishing an entitlement to bail.
- D. An elevated standard of proof must be satisfied.
- E. The person seeking bail cannot be a risk of flight or a danger to the community.

## PRESUMPTION AGAINST BAIL

■■■ The presumption of innocence guarantees that defendants pending trial are entitled to a concomitant presumption in favor of bail in this country. The Bail Reform Act "mandates release of a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir.1985); 18 U.S.C. §§ 3141 *et seq*. However, in foreign extradition cases, a presumption against bail exists due to the foreign relations interest of the United States in successfully returning persons subject to criminal prosecution to the requesting country. *Wright v. Henkel*, 190

U.S. 40, 63, 23 S.Ct. 781, 787, 47 L.Ed. 948 (1903) (bail "should not ordinarily be granted in cases of foreign extradition"); *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989).

## ESTABLISHING AN ENTITLEMENT TO BAIL AND STANDARD OF PROOF

"The standard for release on bail for persons involved in [foreign] extradition proceedings is a more demanding standard than that for ordinary accused criminals awaiting trial." *Hu Yau–Leung v. Soscia*, 649 F.2d 914, 920 (2d Cir.1981), *cert. denied*, 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 389 (1981). "While the term 'special circumstances' has eluded precise judicial definition, those courts that have granted bail have limited those instances to the 'most pressing circumstances' and those in which the court finds that the 'requirements of justice are absolutely peremptory.'" Pamela B. Stuart, *Treaty Traps: How to Get Your Client Through the Maze of Extradition*, 6 Crim. Just. 24 (Winter 1992) (quoting *United States v. Williams*, 611 F.2d 914, 915 (1st Cir.1979), in turn quoting *In re Mitchell*, 171 F. 289 (S.D.N.Y.1909) (Judge Learned Hand)).

Examining synonymous or associated phrases used in place of, or along with, the term "special circumstances" illuminates its meaning. Some courts have used the word "exceptional" while most cases have limited the finding of "special circumstances" to situations where the "justification is pressing as well as plain." *See e.g., United States v. Leitner*, 784 F.2d 159, 160 (2d Cir.1986); *United States v. Williams*, 611 F.2d 914, 915 (1st Cir.1979); *United States v. Hills*, 765 F.Supp. 381, 385 (E.D.Mich.1991); *Koskotas v. Roche*, 740 F.Supp. 904, 918 (D.Mass.1990), *aff'd*, 931 F.2d 169 (1st Cir.1991); *Extradition of Russell*, 647 F.Supp. 1044, 1049 (S.D.Tex.), *aff'd*, 805 F.2d 1215, 1217 (5th Cir.1986); *In re Klein*, 46 F.2d 85, 85 (S.D.N.Y.1930).

When the Ninth Circuit, in *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989), cited three cases as authority for examples of acceptable special circumstances,[4]

**4.** The three "[e]xamples of such [special] circum-    stances include the raising of substantial claims

each case employed an elevated standard of proof: (1) *Aronson v. May*, 85 S.Ct. 3, 13 L.Ed.2d 6 (1964) (petitioner sought bail pending appeal of habeas corpus petition; court demanded greater showing of the special reasons required for bail); (2) *United States v. Williams*, 611 F.2d 914, 915 (1st Cir.1979) (bail denied in international extradition proceeding because no pressing and plain special circumstances); and, (3) *Galante v. Warden*, 573 F.2d 707, 708 (2d Cir. 1977) (bail granted pending parole revocation hearing only under "most unusual, extraordinary or exceptional circumstances"). Just as the Ninth Circuit looked to similar situations to provide examples of special circumstances, it also implicitly adopted the heightened standard of proof used in those and similar cases.

A pair of analogous situations exist under the Bail Reform Act concerning bail pending sentencing or notice of appeal and bail for persons convicted of certain serious offenses. Rule 46(c) of the Federal Rules of Criminal Procedure provides as follows:

> Eligibility for release pending sentence or pending notice of appeal or expiration of the time allowed for filing notice of appeal, shall be in accordance with 18 U.S.C. § 3143. The burden of establishing that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant.

Those same provisions are made applicable to any person in custody pending a revocation hearing for alleged violations of conditions of probation or supervised release pursuant to Rule 32.1(a)(1) of the Federal Rules of Criminal Procedure. Section 3143 requires the court to find by "clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released." Although this statute and Federal Rule of Criminal Procedure 46(c) have no direct application in this case, they resemble the extradition situation in the lack of a presump-

tion for bail, and the need for the person seeking release to establish an absence of flight risk and danger by a heightened standard.

A person convicted of a crime of violence as defined in Section 3156(a)(4), or an offense for which the maximum sentence is life imprisonment or death, or a drug offense for which a maximum term of imprisonment of ten years or more is prescribed, is automatically detained under Section 3143(b)(2). Congress provided a safety valve in this statute that is nearly identical to the treatment of bail questions in international extradition cases. Section 3145(c) provides that a person subject to automatic detention pending appeal may be released "if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate" and that the person would meet the conditions of release set forth in Section 3143, including clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released. The similarities are overwhelming.

▮ Finally, the plain meaning of "special circumstances," and the definitional language used by the courts in interpreting and applying special circumstances, justify the application of the clear and convincing standard of evidence.[5] Therefore, a person subject to international extradition may overcome the presumption against bail by presenting clear and convincing evidence demonstrating "special circumstances" justifying release pending extradition proceedings and that the person will not flee or pose a danger to any other person or to the community.

*Analysis*

No precise structure for the legal analysis of applications for bail pending extradition emerges from the caselaw. Some courts first consider flight risk and then progress to

---

upon which the appellant has a high probability of success, a serious deterioration of health while incarcerated, and unusual delay in the appeal process." *Salerno v. United States*, 878 F.2d at 317.

**5.** The "pressing and plain" language often used in conjunction with special circumstances, see text and citations supra, further justifies a clear and convincing standard, as "plain" is a synonym for "clear." *Webster's New World Thesaurus*.

special circumstances, while other courts begin with special circumstances and then consider risk of flight. Given that special circumstances are absolutely required for bail, and that risk of flight is not determinative, the best approach first explores special circumstances, and then, only after a finding of special circumstances, examines risk of flight.

SPECIAL CIRCUMSTANCES

The prior extradition cases considering special circumstances, clearly reveal the difficulty of establishing sufficient circumstances for bail pending extradition. The published opinions of other federal courts at the trial and appellate level reveal that bail is usually denied, and that this denial is almost always due to a lack of special circumstances. Rather than explaining what factors constitute special circumstances, most cases therefore teach what facts or factors are not adequately special.

The Ninth Circuit Court of Appeals in *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir.1989), gave three examples of special circumstances: (1) raising substantial claims upon which appellant has a high probability of success, (2) serious deterioration of health while incarcerated, and (3) unusual delay in the appeal process. These factors are identical to those identified two years earlier in *United States v. Bell*, 820 F.2d 980, 981 (9th Cir.1987), to show exceptional circumstances that would justify a person's release pending appeal from an order revoking probation.

Although most cases focus on a single special circumstance, courts are now recognizing that the cumulation of several factors may constitute special circumstances that justify bail pending extradition proceedings. *See, United States v. Taitz*, 130 F.R.D. 442 (S.D.Cal.1990). Further, special circumstances need to be extraordinary and not factors applicable to all defendants facing extradition. *Extradition of Smyth*, 976 F.2d 1535, 1535–36 (9th Cir.1992) (the court recognized the need to consult with counsel, gather evidence, and confer with witnesses as important, but not extraordinary). Finally, the absence of flight risk "is not the criteria for release in an extradition case." *Salerno v. United States*, 878 F.2d at 318 (citing

*Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir.1984)).

### 1. *Substantial Claims*

Nacif has filed a Motion to Quash Complaint for Provisional Arrest (# 7). That motion argues three grounds for quashing the complaint which resulted in Nacif's provisional arrest. Two of these grounds, failure to demonstrate sufficient urgency and failure to use appropriate diplomatic channels, have very little merit. The court does view Nacif's third ground, failure to set forth adequate facts establishing probable cause justifying provisional arrest, as having some merit.

However, while this third argument displays some conceivable possibility of success, this court remains far from persuaded that a "high" probability of success exists. The Motion to Quash (# 7) remains under submission to the court and an appropriate order will issue shortly. At this time the court does not regard the arguments contained in the Motion to Quash (# 7) as substantial claims with a high probability of success warranting a finding of special circumstances.

### 2. *Serious Deterioration of Health*

In other international extradition cases health concerns have played a role in establishing "special circumstances." For instance, in *United States v. Taitz*, 130 F.R.D. 442 (S.D.Cal.1990), the extraditee suffered from allergic reactions to corn and corn sweeteners, common substances in the food at the detaining correctional center, and an allergic reaction to the soap used to launder the inmates' clothing at the center.

Nacif has only one kidney, and argues that this fact raises health concerns warranting release on bail. A letter from Dr. Elias Dergal Badue, F.A.C.S., in Mexico, Exhibit U of the June 11 hearing, indicates that Nacif's diet must consist of fresh fruit, vegetables, and low fat, and that he "must be careful to avoid certain foods, so he will not have serious medical problems." Furthermore, Nacif must exercise daily, and must have sufficient liquids to maintain good health.

Although Nacif's health condition concerns the court, his condition is not debilitating, and is apparently easily controlled. This court has the authority to order Nacif's jailers to attend to his needs on these matters. Perfect health has never been a requirement of institutional incarceration. *See, e.g., United States v. Morin*, 889 F.2d 328 (1st Cir. 1989) (imprisonment of defendant in "disastrous physical condition"); *United States v. Pappadio*, 479 F.Supp. 407 (S.D.N.Y.1979) (court expresses sympathy for condition, but imprisons anyway). Indeed, many inmates require particular diets or conditions to maintain the constitutional status of confinement. *See, United States v. Kidder*, 869 F.2d 1328, 1330–31 (9th Cir.1989) (to avoid incarceration defendant "must show that *no* constitutionally acceptable treatment can be provided while he is imprisoned").

At the hearing Nacif argued that he has not had adequate exercise while incarcerated at the Clark County Detention Center. Upon further examination by the court however, it became apparent that Nacif's complaint concerned the fact he could not exercise outdoors as was his custom. Transcript of Hearing on June 11, 1993 (Tr. at 67). Thus Nacif's incarceration does not preclude adequate indoor exercise.

Nacif also argued that he needs a specialized diet not available at the detention center. Yet Nacif has not taken any steps while incarcerated to obtain this specialized diet. Tr. at 67. More importantly, Nacif has not provided sufficient detail of his condition or needs to convince this court by clear and convincing evidence that the severity of his condition comprises a special circumstance warranting release on bail. Nacif's counsel has made representations to the court regarding alleged discomfort and his weight loss. *United States v. Williams*, 611 F.2d 914, 915 (1st Cir.1979) (discomfiture in jail is not a special circumstance). However, more reliable and quantifiable evidence, including documented medical evidence from a physician, would be required for an adequate showing.

Therefore, although medical concerns certainly could qualify as special circumstances, Nacif has failed to prove by clear and convincing evidence a serious deterioration of health.

### 3. *Unusual Delay*

■ The third special circumstance recognized in *Salerno* is unusual delay in the appeal process. This factor does not apply in Nacif's case as there are no appeals pending. The opinion of *United States v. Williams*, 611 F.2d 914, 915 (1st Cir.1979), mentions a delayed extradition hearing as a possible special circumstance. However, there is no indication that Nacif's extradition hearing has been delayed. Indeed, the official documentation from Mexico has not yet arrived in the United States or reached this court. Article 11 of the extradition treaty between United States and Mexico allows sixty days after the provisional arrest for Mexico to lodge the formal extradition request with the U.S. Department of State. That period has not expired yet. Therefore a finding of unusual delay at this stage of the proceedings would be premature.

### 4. *Timing of the Provisional Arrest*

■ Nacif argues that the timing of his provisional arrest is a "special circumstance" which the court should consider. Motion for Bail (# 10) at 20–23. Nacif was on vacation in Las Vegas when a warrant for his arrest was issued in Mexico, and thus, he alleges the underlying facts fail to indicate that he entered the United States in an effort to flee Mexico and avoid prosecution there. Nacif emphasizes his status as an international traveller and guest in the United States on a planned vacation.

Additionally, Nacif finds it peculiar that the Mexican authorities sought a provisional arrest immediately after filing the underlying criminal charges. Further, Nacif declares that

recent extortive demands for payment of monies far exceeding the alleged taxes owing suggest a scurrilous motive for seeking his arrest in the U.S. Perhaps the Mexican government sought the oppressive and constrained process of extradition in order to promote [Nacif's] custodial detention and in a colorable effort to use the extradi-

tion process to extort monies from him....

Motion for Bail (# 10) at 22. Nacif's counsel moderated the tenor of this argument when he asked the Court to strike all references to "extortion" by him in the case. Tr. at 85.

While the timing and surrounding factual details of Nacif's provisional arrest are unusual, and even perhaps somewhat suspicious, Nacif has failed to demonstrate by clear and convincing evidence that this gives rise to a special circumstance justifying bail. Though Nacif's counsel has argued that the procedures used here by the Mexican government against Nacif are improperly coercive and outrageous, Nacif has never presented the court any concrete evidence of wrongdoing by Mexican governmental agencies.[6]

█ Moreover, Nacif's argument questions the Mexican Government's motivation for seeking his extradition. Based on the "rule of non-inquiry," federal courts will not scrutinize the motives of a foreign Government seeking extradition. *Koskotas v. Roche,* 931 F.2d 169, 173–4 (1st Cir.1991) (rule of non-inquiry firmly rooted in comity considerations because extradition proceedings necessarily implicate the foreign policy interest of the United States which are committed to the sole discretion of the Secretary of State); *Extradition of Manzi,* 888 F.2d 204, 206 (1st Cir.1989), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990) (deference to executive branch because of its exclusive power to conduct foreign affairs).

Therefore, this court has no authority to examine internal political questions of a foreign nation's government or law enforcement, and will not consider ulterior motivation as a special circumstance. *Koskotas,* 931 F.2d at 174 (whether a request for extradi-

tion is a subterfuge to punish the extraditee is a question for the Secretary of State).

### 5. *Offer of Compromise*

█ It appears that Nacif has made efforts to resolve his taxation difficulties with the Mexican Secretary of Finance. Motion for Bail (# 10) at 22–24. In particular Nacif has sent letters to the Secretary of the Department of Revenue and Public Credit and to the Federal Tax Administration of the North of Mexico City attempting to compromise the tax claims. Motion for Bail (# 10) Exhibits K & L. During the hearing, Nacif's counsel indicated that attempts continue to settle the matter. The court also notes that Nacif has retained counsel in Mexico to help resolve this matter.

Nacif relies on an unpublished opinion to assert the proposition that a good faith effort to resolve his tax dispute merits consideration as a "special circumstance." *Extradition of Alfie–Cassab and Cassab–Hanono,* No. 89–2493M (S.D.Cal. July 5, 1989).[7] Nacif also contends that despite his attempts at a reasonable compromise, the Mexican Government persists in unreasonable demands.

Nevertheless, just as the court will not explore any underlying motives of Mexico's request for provisional arrest, the court will not question what constitutes a good faith offer of compromise by a foreign government agency.

It is not clear that an offer to compromise is a "special circumstance." Without additional factual information demonstrating a highly unusual situation, this court finds nothing "special" about Nacif's attempts to resolve his dispute directly with the requesting nation.

---

**6.** Three representatives of Mexico attended the evidentiary hearing: Juan Miguel Ponce, Consul for Legal Affairs, and two representatives from the Attorney General's Office, Mario Mejia–Juizar, Deputy Attorney General Fiscal Matters Department, and Enrique Romero, Deputy Attorney General Office of International Affairs. Tr. at 62. Although Nacif's counsel secured an order of the court authorizing the examination under oath of Mario Mejia–Juizar (Tr. at 79), neither Mejia nor

the other two representatives of Mexico were called to testify by Nacif.

**7.** In fact, Nacif has provided copies of many unpublished orders to support various arguments. In accord with Ninth Circuit Rule 36–3, which provides that unpublished dispositions are not precedential, this court will not consider or rely on these orders as it would published opinions.

### 6. Length and Complexity of the Extradition Proceeding

Nacif argues that the estimated length and complexity of the extradition proceeding comprise a special circumstance which warrants release on bail. Nacif submits that his extradition proceeding could last for two years, because in order to properly defend against the allegation, he must trace his financial transactions for several years prior to 1991, reconstruct his financial records for 1991, and demonstrate all sources of income for taxable purposes.

An extradition proceeding, however, is not a trial of guilt or innocence. Instead it resembles a preliminary examination conducted pursuant to Rule 5.1 of the Federal Rules of Criminal Procedure to determine whether the accused shall be held for trial. Treaty, Article 3. Therefore the person sought is not entitled to introduce evidence which merely supports a defense. Nacif may offer limited evidence to explain or clarify elements in the demanding nation's case against him. *Abu Eain v. Adams,* 529 F.Supp. 685, 691 (N.D.Ill.1980). Likewise, Nacif may introduce evidence to rebut probable cause. Sometimes it may be difficult to draw the distinction between what evidence is allowable and what evidence instead relates directly to a defense. However, the admission and evaluation of evidence in extradition proceedings is committed to the sound discretion of the court. *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922); *Sayne v. Shipley,* 418 F.2d 679, 685 (5th Cir.1969), *cert. denied,* 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 61 (1970).

The evidence which Nacif claims will take so long to compile actually appears to be evidence attacking the underlying claim, and therefore supports a substantive defense. Furthermore, Nacif has not shown by clear and convincing evidence that the extradition proceeding will take as long as he contends. Nacif's counsel indicated that the preparation of documents and evidence for the extradi-

tion hearing is already under way. Tr. at 60. Nacif has also retained counsel in Mexico to address the issue at its source, and attempts to settle the matter continue. Motion for Bail (# 10) Exhibits K & L. Additionally, Nacif includes in the estimated two years the time the case might consume on appeal to the Ninth Circuit. Tr. at 58.

In *United States v. Taitz,* 130 F.R.D. 442, 445 (S.D.Cal.1990), the projected length of the proceedings was considered a "special circumstance." In *Taitz,* the court was faced with a magnitude of evidence required for a determination of whether probable cause existed for each of four hundred and thirty-four counts of fraud and false statements. The court also found that "[f]urther complicating the question of extraditability is the issue of whether the offense charged constitutes 'fraud' as defined in [the applicable] treaty." *United States v. Taitz,* 130 F.R.D. at 445.

Nacif's case on the other hand is "akin to a net worth case" according to his counsel. Tr. at 63. Although hundreds, or even in excess of a thousand pages of documents must be reviewed, only one tax year, 1991, is at issue. Tr. at 62 & 64.

Nacif might have a strong defense against the Mexican Government, but this court is in no position to examine any defenses. Nacif has not established that the length and complexity of his extradition rises to the level of a "special circumstance."

### 7. Seriousness of the Offense

Nacif argues that the nature of the offense in and of itself may constitute a "special circumstance." Specifically, Nacif emphasizes that because he is charged with an economic offense under the income tax laws of Mexico, he should be afforded bail.

To support his contention, Nacif cites five cases [8] in which extraditees facing underlying financial crimes had received bail in earlier proceedings. However, none of these opinions discussed the granting of bail or the

---

**8.** *United States v. Galanis,* 429 F.Supp. 1215 (D.Conn.1977); *Extradition of Sindona,* 450 F.Supp. 672 (S.D.N.Y.1978); *Freedman v. United States,* 437 F.Supp. 1252 (N.D.Ga.1977); *Wacker v. Beeson,* 256 F.Supp. 542 (E.D.La.1966), *aff'd,* 370 F.2d 552 (5th Cir.), *cert. denied,* 387 U.S. 936, 87 S.Ct. 2063, 18 L.Ed.2d 999 (1967); *Schonbrun v. Dreiband,* 268 F.Supp. 332 (E.D.N.Y.1967).

special circumstances standard and are therefore of no value in exploring this issue.

Moreover, approximately one-third of the extradition cases in the United States concern financial fraud. Roger M. Olsen, Deputy Assistant Attorney General, Reform of the Extradition Laws of the United States: Hearings on H.R. 2643 Before the Sub–Committee on Crime, 98th Cong., 1st Sess. 34 (1983). Thus, viewing the nature of the offense discloses nothing "special" about Nacif's case, and indeed the court can envision no situation in which the underlying offense itself would justify release on bail. The nature of the underlying offense, however, is a factor in evaluating risk of flight.

### 8. Character of the Extraditee

■ Nacif believes that his character and demeanor amply justify release on bail. He emphasizes his marriage of seventeen years with two children, lack of any noteworthy prior criminal record, and success as an entrepreneur noted for integrity and honesty. To bolster his assertions regarding character and demeanor, Nacif has supplied the court with eighty-five letters from business associates and others, primarily residents of Mexico, who know him and can attest to his character.

Occasionally, courts have found a person's character and background to be a special circumstance. *Hu Yau–Leung v. Soscia,* 649 F.2d 914, 920 (2d Cir.1981) ("the court listed the 'special circumstances' as involving Hu's age and background along with the lack of any suitable facility in which Hu could be held"); *United States v. Taitz,* 130 F.R.D. 442, 446 (S.D.Cal.1990) ("Taitz has no prior record and ... [t]here is no allegation that he is a danger to any community on the basis of violence or continuing criminal conduct"). More often, the character and background of a person subject to extradition are considered in regard to risk of flight and danger to the community, rather than as a special circumstance.

In addition to the character letters, Nacif has indicated that many of his friends and business associates are willing to post bond on his behalf. These letters and assurances, however, do not establish a "special circum-stance." While the court applauds the efforts taken to compile this multitude of letters, and the past integrity demonstrated by Nacif to win the confidence of so many individuals, bail would be inappropriate on this basis.

### 9. Bail Considerations in Mexico

Nacif argues that he would be entitled to bail in Mexico if he had been arrested and was facing trial for these charges there. Nacif then cites *United States v. Taitz,* 130 F.R.D. 442 (S.D.Cal.1990), for the proposition that if bail would be granted in the requesting foreign country, then bail should be granted by the United States when conducting extradition proceedings. Motion for Bail (# 10) at 18–20.

However, Nacif misapplies the ruling in *Taitz* and thereby confuses two separate issues.

### (a) Bail for American Extraditees

■ In *Taitz* the magistrate judge granted bail to a person from the Republic of South Africa, in part, because South Africa grants bail to foreigners in South African custody for extradition on the same offense. *Taitz,* 130 F.R.D. at 447. Thus, the correct analysis, under *Taitz,* would be to determine if bail would be given in a comparable extradition case, dealing with an equivalent charge, in the foreign country, not whether bail would be available on the substantive charge.

With this clarification, the court notes that Nacif has presented no evidence on whether Mexico would grant bail to a U.S. citizen facing extradition for similar income tax charges under equivalent circumstances in Mexico. Therefore Nacif has not met his burden. Furthermore, even if Nacif did show that Mexico would grant bail to an American in this situation, it does not automatically follow that Nacif is entitled to bail. Disparate treatment does not constitute a sufficiently special circumstance per se to justify bail. For example, in *United States v. Williams,* 611 F.2d 914, 915 (1st Cir.1979), Canada sought the extradition of two brothers. When one of the brothers received bail

and the other did not, the detained brother unsuccessfully argued that this difference in treatment was a special circumstance that mandated bail.

### (b) Bail on the Substantive Offense

██ Nevertheless, though Nacif initially failed in his attempt to support his reciprocal bail argument with legal authority, he subsequently cited *In re Gannon,* 27 F.2d 362 (E.D.Pa.1928), on this significant point. In *Gannon* the court granted bail to an extraditee from Canada (at the time still governed by the extradition treaty with Great Britain). The court found that the availability of bail for the underlying substantive offense in both Pennsylvania, where the extraditee was arrested, and the requesting nation, constituted a special circumstance worthy of bail. *Gannon* does not use the phrase "special circumstances," but does cite *Wright,* which establishes this standard. *Gannon* granted bail because of the availability of foreign bail.

Nacif also substantiates his position by providing the court with a translation of Article 92 of the Mexican Fiscal Code, under which he would receive bail if arrested in Mexico. Additionally, Nacif has provided a favorable legal opinion from an attorney in Mexico, Mariano Herrera Borrell, who has twenty years of experience in criminal law. Motion for Bail (# 10) Exhibit J. Lastly, Nacif's presentation regarding the availability of bail details how bail would be calculated in Mexico.

Therefore, Nacif has established by clear and convincing evidence that bail would be available in Mexico on the underlying substantive offense, and that this constitutes a "special circumstance."

### Conclusion

Nacif presents the court with a multitude of alleged special circumstances, of which only one rises to the level required for bail in an extradition case. The availability of bail under the law of Mexico entitles Nacif to bail pending extradition if he is not a risk of flight or danger to others.

### FLIGHT RISK AND DANGER

██ Having found a special circumstance, this court must then assess flight risk. Risk of flight is not a "special circumstance" in an extradition case. *Salerno v. United States,* 878 F.2d 317, 318 (9th Cir.1989). Instead, evaluation of flight risk remains a separate and independent consideration, which includes an assessment of danger to any other person or to the community. Because the primary concern of the United States is to return the person sought to the requesting country, the court will not grant bail if the person is a risk of flight or danger.

Accordingly, a person seeking bail pending international extradition must establish by clear and convincing evidence "special circumstances" and that the person will not flee or pose a danger to any other person or to the community. Although not directly applicable to international extradition cases, Title 18, United States Codes, Section 3142(g) provides a detailed outline of traditional factors used to assess risk of flight.

██ First, examining the nature and circumstances of the offense charged, the court finds Nacif faces charges for a purely economic crime, failure to pay income tax, rather than for a crime involving violence. Likewise, the court has no basis upon which to believe that Nacif might pose a danger to any specific individuals or the community as a whole. At the time of his arrest Nacif was not on probation, parole, or any other form of custodial release, nor is there any indication of drug abuse, alcohol abuse, or a criminal history which would militate against release on bail. Similarly, there is no indication that his physical or mental condition would bar release, nor has he exhibited a record of failing to appear at court proceedings.

Furthermore, Nacif apparently has strong ties to Las Vegas, Nevada. Nacif has secured a residence in Las Vegas. Motion for Bail (# 10) Exhibit I. He has traveled frequently to Las Vegas, and apparently enjoys the attractions of this city. *See e.g.,* Motion for Bail (# 10) Exhibit F.

Moreover, while Nacif's strongest ties are to Mexico, he has demonstrated a sincere desire not to return there under these circumstances by vehemently contesting every phase of these extradition proceedings. Lastly, the Government has raised the con-

cern that Nacif might flee to yet another country, perhaps somewhere in Europe. However, this allegation has not been substantiated in any way.

Finally, the numerous letters of good character and friends in Las Vegas willing to vouch for Nacif's character and provide him lodging and money for bail, also compel bail and diminish the risk of flight. Overall then, the court finds that Nacif has presented clear and convincing evidence that he is not a risk of flight, if sufficient bail is posted.

## AMOUNT OF BAIL

■ Having determined that bail is appropriate, the court must fix an amount that would guarantee Nacif's appearance at future hearings, and if necessary, his surrender to Mexico. In light of the special circumstance underlying the grant of bail in this case, the court looks to the amount of bail Mexico would set for Nacif under Mexican law.

Nacif's motion for bail explains that

if apprehended in Mexico on a domestic warrant for a 'fiscal crime,' [Nacif] would be afforded bail. Article 92 of the Fiscal Code of the Federation ... sets forth that any person charged with a fiscal crime ... **shall** be entitled to bail. Bail is to be set by the judicial authority in an amount equal to the sum of tax liability owed, plus interest and surcharges.... [T]he judicial authority may reduce the amount of bail up to twenty (20%) percent.

Motion for Bail (# 10) at 18–19 (emphasis in original). Nacif also submits a translation of Article 92 of the Fiscal Code of the Federation for the court's independent assessment. After study of the statute, the court finds Nacif's interpretation valid. Additionally, the court acknowledges that Nacif's counsel has represented other clients facing extradition to Mexico on charges of financial crimes and is well versed in this foreign law. Nacif also tendered a legal opinion letter from a Mexican attorney familiar with this statute confirming his counsel's explanation. Motion for Bail (# 10) Exhibit J. Therefore, based upon its own analysis and the guidance provided by Nacif's presentation, this court will apply the Mexican law.

Mexico's claim against Nacif totals Fifteen Million, Five Hundred Sixty–Seven Thousand, One Hundred and Eighty Dollars ($15,-567,180.00) (all monetary sums in this section are in U.S. Dollars unless specifically denoted otherwise). Complaint (# 1) at 2. As explained above, a 20% reduction of the bail amount is available under the law of Mexico when adequate collateral is provided for the alleged tax debt. Uncontradicted evidence shows that Eight Million Dollars of securities owned by Nacif are subject to embargo (a lien) in Mexico. Tr. at 89. The Court finds this security sufficient collateral to allow the 20% bail reduction afforded by Mexican law.

Therefore, Nacif is entitled to release on bail in the amount of Twelve Million, Four Hundred Fifty–Three Thousand, Seven Hundred Forty–Four Dollars ($12,453,744.00). Nacif should not be released on any bail less than the amount he would be required to post in Mexico.

Nacif's counsel contends that the highest bail set for an individual in an extradition case was for Imelda Marcos in which the court set bail at Five Million Dollars. Affidavit attached to Motion for Bail (# 10) as Exhibit S. Nevertheless, Nacif's case is distinguishable from that of Imelda Marcos, especially given her international notoriety. While both Marcos and Nacif possess substantial wealth, Marcos, as a political figure who received extensive media attention, could not travel or conceal herself as easily as Nacif.

Therefore, this court finds abundant evidence to justify a bail of $12,453,744.00.

First, Exhibit V, submitted at the hearing on June 11, 1993, is a copy of a check from Caesars Palace Hotel & Casino to Nacif in the amount of $2,411,028.00 dated May 13, 1993. Thus the court has definitive proof of these funds.

Second, the Complaint (# 1) at 2–3 notes three bank accounts in Mexico, and enumerates four deposits in Mexican Pesos to these accounts in the following amounts: $287,789,-406,910 Pesos; $8,074,092,889 Pesos; $105,-692,657,593 Pesos; and $1,292,261,719 Pesos. While one basis of Nacif's defense lies in disputing the Mexican government's treat-

 

ment of these deposits, they nonetheless evidence notable wealth.

Third, the Government alleges Nacif came to Las Vegas with $4,000,000.00 in gambling money. There are also indications that over the past nine years Nacif has lost $28 million dollars gambling at one casino alone.[9] Tr. at 75.

Fourth, Nacif related that his annual income is in excess of $1,000,000.00. He also reported the following assets: a Denim factory (worth $50,000,000.00); 60% ownership of an orange grove and a dairy farm (combined worth of $40,000,000.00); cash on hand of $200,000.00 in a checking account in Los Angeles; three Mercedes Benz automobiles (combined worth of $150,000.00); two residences in Mexico (worth $500,000.00 and $300,000.00); and a private airplane (worth $1,000,000.00).

Fifth, Nacif claims Mexico has frozen $8,000,000.00 in securities.

Sixth, Nacif has approximately $15,000,000.00 in liabilities.

Finally, assertions at the hearings and letters from Nacif's friends display a willingness of various interested friends and associates to contribute at least $2,000,000.00 to his bail. *See e.g.,* Letter from Jack Binion, President of the Horseshoe Hotel & Casino, attached to Motion for Bail (# 10) as exhibit T.

Therefore the court finds a bail of $12,453,744.00 reasonable in this case. While such an amount would be prohibitively high and appear as a punitive means of imposing incarceration for the vast majority of extraditees, in the case of Nacif this amount is eminently appropriate in light of his apparent wealth.

### ORDER

Based on the foregoing, and good cause appearing therefore,

IT IS HEREBY ORDERED that the Motion for Bail Pending Extradition Proceedings (# 10) is granted.

IT IS HEREBY FURTHER ORDERED that bail is set at Twelve Million, Four Hundred Fifty–Three Thousand, Seven Hundred Forty–Four Dollars ($12,453,744.00).

IT IS FURTHER ORDERED that Nacif's travel is restricted to Nevada.

DATED this 16th day of July, 1993.

---

9. This figure does not reflect offsets of approximately $3 million dollars given to Nacif as travel reimbursement, a 10% to 15% discount on his losses afforded by Caesars Palace in light of his substantial gambling, and complimentary rooms and meals over this time period.